Depending on the time frame and our tolerance, we may take a recess after the first two, but we'll see how it goes. The first case is Gulf Restoration Network v. McCarthy. Mr. Littleton. Good morning, Your Honor. Matthew Littleton representing the Environmental Protection Agency. With me at council table is Peter Ford. You may have to speak up. Is the microphone – oh, you have your hands – see that little black thing? That's the microphone. So you can just leave it there. Just don't cover it up. Okay. Otherwise, there will be no record of your speaking. Can you hear me now okay? Yeah, a little. Better. Every other word. I'm Matthew Littleton representing the Environmental Protection Agency. With me at council table is Peter Ford from that agency. May it please the Court. The district court's decision here ordering the EPA to make necessity determinations for every water quality standard requested by Gulf Restoration's petition should be reversed. I'd like to focus this morning on two issues. First, whether the district court had jurisdiction to review the EPA's discretionary decision not to make necessity determinations. And second, whether Massachusetts v. EPA foreclosed the EPA for any reason from declining to make necessity determinations.  And our argument here is based on the fact that Section 701A2 of the APA, which is a limit on the sovereign immunity waiver in Section 702 of the APA, withdraws from judicial review any agency decision that is committed to agency discretion by law. And EPA's decision not to make a discretionary necessity determination falls within the scope of Section 701A2. That conclusion follows first from the text of Section 1313C4B of the Clean Water Act, which indicates that in any case where the administrator determines that a revised or new standard is necessary to meet the requirements of this chapter, meaning the Clean Water Act, further statutory obligations will ensue. That text expressly vests the EPA administrator with open-ended discretion to make that determination and determine whether, among all of the water quality standards throughout the nation, EPA is going to prioritize and invest its resources in investigating a particular problem. Second, the structure— Well, it can make that determination or it can not make the determination. That's right, and EPA did not make the determination in this case. And the other aspect here that is important is the structure of the Clean Water Act, which gives states primacy of setting their own water quality standards. EPA is assigned a secondary oversight and enforcement role where the agency reviews those standards, but once the standards are in place, there's no statutory obligation on the part of EPA to police the state standards on an ongoing basis. Is there any penalty for the states if they decide not to comply? Well, the penalty for the states is that EPA ultimately has the authority to set the water quality standards for them, thus removing the statutory role that the Clean Water Act intended for the states. How many times has that happened? It's happened roughly in the 40 years of the Clean Water Act about 10 times. So EPA certainly believes it has the authority to do that, but it has historically been very reticent to do that in line with congressional intent. And those 10 times, they're called positive determinations? Those are positive necessity determinations, and they're all listed in a footnote in our brief. There's a website that actually lists all the positives. Once there's a positive determination, then there clearly is reviewability in district court? So that issue is not presented here, but certainly once there's a positive necessity determination, there are going to be new water quality standards instituted either by the state or by the EPA, and those clearly would be reviewable because there would be rulemaking in that context. That goes through the whole rulemaking process? Right. That, at that stage— Takes on a life of its own at that point. Exactly. So it's not binary rulemaking enforcement. It's rulemaking and several sort of chronological steps to the triggering moment? Exactly, and plaintiffs try to draw a sharp distinction between rulemaking and enforcement, but here what we have is the question of whether EPA makes the threshold determination of whether the water quality standards are necessary. Once it makes that determination, then rulemaking obligations are entailed. What if the record were absolute that the state wouldn't review or wouldn't revise? In other words, if there were a certainty that the state wasn't going to comply, and yet EPA didn't take any action? So— Would there come a point where there would be reviewability of the EPA's refusal? So, first of all— I know those aren't your facts. That would be—concede a more difficult case. However, again, we have Congress not providing any meaningful standard for courts to review the EPA's prioritization among all kinds of water quality problems throughout the nation. So the lack of standard is sort of the manageability issue more than the scientific thresholds that— But it is a manageability issue, and that distinguishes this case from Massachusetts v. EPA, where you had EPA charged with protecting the states and setting water quality standards on a national basis, where the states had no authority to do so. Here you've got the states clearly given authority under the Clean Water Act to set water quality standards in the first instance, and they're required to review those and update them. And EPA has oversight. But the oversight that EPA has over the state water quality standards, we think—and we think this Court's decision in Public Citizen supports this view—that there's an analogy that this is more like an enforcement scheme than it really is like a rulemaking. And there's no—as I said earlier, there's no binary distinction that Massachusetts v. EPA— If EPA said we interpret this statute to not allow us the authority, that would be reviewable. So then you have a question which Heckler v. Cheney left open, which is when there's a statutory abdication or EPA says we lack jurisdiction to even consider the problem, again, that would be a more difficult case, but it's certainly not one we have here. In fact, in this case, EPA's petition denial letter clearly indicated that EPA has authority to do this. It may use that authority in the future. In fact, it has used it in the past. But it's not saying that it can't do it. It's saying that it's choosing not to in light of the ongoing cooperative federal-state efforts. And that takes me to another— But that's its reason for not exercising its discretion. That's its reason in this case, yes. And the district court never reviewed that reason because the district court concluded—we argue incorrectly—that EPA, once it's petitioned, has to make an up-or-down necessity determination. Essentially what that would mean is that you have a statute that says in any case where the administrator determines a standard is necessary is transformed into a mandatory duty merely by the filing of a petition. And that is not what was intended by the EPA's petition provisions. And it's also clearly contrary to Massachusetts v. EPA, which made clear that the EPA has had the option in that case, as it does here. So what do you ask this court to do? So we're asking this court to reverse and vacate the district court's order and hold that the district court lacked jurisdiction to review the EPA's decision not to make necessity determinations. If you conclude that the district court did have jurisdiction, then we're asking for a remand for the district court to consider in the first instance whether EPA gave a reasoned justification. The district court hasn't embarked on that here. You have a very complicated record. It hasn't been briefed, and so— That's a legal issue. Why can't we just render judgment—reverse and render? Well, it is a legal issue. However, again, it hasn't been briefed, hasn't been addressed by the district court. The full scope of the considerations that could inform EPA's threshold decision not to make a necessity determination is not something that EPA has addressed here. But it was in the letter. The letter goes through and gives reasons in this case, but the letter doesn't say here's the full scope of things we think we can consider in declining to make a necessity determination. The other reason to remand is that there are a number of parties in the district court, including several states, that are not parties to this appeal who may very well have views on this issue. So, again— That's your case. If you want it remanded rather than rendered, that's fine. Well, again, our— Careful what you ask for. Our principal argument is that it should be— The jurisdictional one. On that point, they cited this National Wildlife D.C. District Court decision that went up. There's dicta in the circuit decision that implies maybe there is jurisdiction. Are you able to comment on that? So, first of all, that would be dicta in the D.C. Circuit's decision, which this Court would not be bound by. Secondly, that was a different statute, and as the Supreme Court has long indicated, as in Heckler, Morris v. Reset, other cases we cited in our brief, it's a statute-specific inquiry. We're not saying that any denial of a petition for rulemaking is unreviewable. What we're saying in this context, there are no judicially manageable standards. All it says is in any case where the administrator determines it's necessary to meet the requirements of this chapter, there's no basis on which this Court could say, well, EPA should prioritize this water quality problem versus another. I mean, there are all kinds of water quality problems throughout the country. But so many administrative issues are intractable, and there are very few that you would ever think that administrative agencies aren't trying to be cooperative with states. So those sort of overarching concepts wouldn't suggest to me that that's what distinguishes this statute from that. So you're, I guess, specifically back to my question, you're saying one dicta and two different statutes, but there's no other response to the discussion in that? Well, I would also point out that I'd go to the Eleventh Circuit's decision in Conservancy of – I can't remember the – The one in your brief, the discussion. Yes, Conservancy of Southwest Florida, where the Eleventh Circuit examined Massachusetts v. EPA and said, look, in that case what the Supreme Court said was that denials of petitions for rulemaking may often be reviewable. There is a distinction there, although as discussed a few minutes ago, the distinction isn't clean in this case. This case actually has a number of aspects that are more like enforcement. But getting back to the Eleventh Circuit's decision, what the Court said was, look, it depends on the context of the specific statute. And what we have here is a statute where it's – you have issues of very delicate federal-state relations. And these are areas in which the judicial branch has historically been reticent to intrude. And by forcing the EPA to defend itself every time a petitioner can file a petition and say, you know what, EPA, you should look at this, you should look at that, these are complicated questions. It may be, but that could be just as powerful an argument for have those delicate reasons articulated. So it isn't just a label, cooperative federalism. It's the articulated reason. Because when you look at the record, it does look like EPA keeps telling the states, we're about to find – we are about to make this necessity. We are. But then three years, five years pass. Not much cooperative federalism occurring. Instead, it's sort of antagonistic. I'd go back to this Court's decision in public citizen, which is binding here, which was, again, a cooperative federalism statute. In that case, in fact, EPA had indicated that the state of Texas was deficient in administering a cooperative federalism program. Nevertheless – so EPA actually recognized that there was a problem. Nevertheless, EPA declined to make the threshold statutory determination. That did not mean that the decision was reviewable. This Court clearly held that this was like an enforcement mechanism over the states, and therefore it was a decision that Congress had withdrawn from judicial review. I have a couple more minutes, and I'd like to briefly get off jurisdiction and move to the merits, just to make clear what our argument is. There is no dispute between the parties of this appeal that Massachusetts v. EPA gave the EPA the option to provide a reasoned justification for declining to make a necessity determination. The dispute between the parties is simply, did the district court do that? Did it give EPA that option? And the plain text of the Court's order makes clear that it did not. What the district court said was that the EPA lacks discretion to decline to make a necessity determination, period. It did not say that EPA's justification in this particular case, the framework memo, the ongoing cooperative efforts, were insufficient. The district court did not say that. If anything, it perhaps indicated the contrary. What the district court did was simply say EPA has to make a necessity determination, and we think that that's clearly problematic under Massachusetts v. EPA, and therefore a remand would be required. Unless the Court has particular questions on our third argument, which has to do with remedy, we'll rest on our briefs on that point. And unless the Court has further questions for me now, I'll reserve the remainder of my time for rebuttal. All right. Thank you, sir. Ms. Alexander? Good morning. May it please the Court, Anne Alexander with the Natural Resources Defense Council representing Plaintiff Appellee's Gulf Restoration Network. With me at council table we have Brad Klein from the Environmental Law and Policy Center and Michelle Hall from the Tulane Law Clinic. I would like to start off with a brief overview of the very important context of this case before I move to my three main points. This is a case about whether EPA has unreviewable discretion to avoid making a determination about whether federal action is necessary to address a major national problem that EPA itself has recognized as such, that being the dead zone in the Gulf of Mexico that's currently about the size of the state of Connecticut. The Clean Water Act gives EPA leadership responsibility to make tough decisions about problems of this nature, but this case is about EPA trying to avoid having responsibility to make any decision and then avoiding judicial accountability. This is at bottom really a pretty straightforward case, and Judge Zaney below appropriately recognized that. EPA is required to give us a straight answer to the statutory question in response to our petition. It need not be an answer that we necessarily like, but first and foremost, that answer has to be grounded in the statute. Now, the three main points that I would like to discuss today are, first of all, the requirement articulated in Massachusetts v. EPA that EPA respond to our petition and the statutory question contained in it, and then I would like to address the appropriateness of judicial review here and the harm done if there is no review, and then I would like to touch on the appropriateness of the remedy ordered by Judge Zaney. So first of all, with respect to Massachusetts v. EPA, notwithstanding EPA's great efforts to distinguish that case, it clearly applies here. It is a very parallel situation, and that case held two very important things for our purposes here. First of all, what it held really very clearly is that when an agency receives a petition for rulemaking that embodies a statutory question, it must respond to that statutory question in response to the petition within the bounds of the statute. The majority was really very clear about that. The dissent was concerned with it. The majority responded to the dissent and said, yes, that is what we're holding. They must respond. And the second important thing that Massachusetts v. EPA said is that this responsibility to respond within the bounds of the statute applies whether the agency is choosing to act or choosing not to act. In other words, the court said the reason for action or inaction must conform to the statutory text. So what that really means is that the agency may answer yes, they may answer no, or they may answer we cannot answer with respect to the statutory factors for the following reasons. But what they're not allowed to do is, first of all, simply to throw out a lot of facts that may or may not apply. So there is a third option, positive, negative. You can see third. I don't read the district court decision to be acknowledging that. The district court decision actually does acknowledge that. Here's what went on in the district court decision. The court clearly relied appropriately on Massachusetts v. EPA and cited it at considerable length, and it included within that citation that exact portion of Massachusetts v. EPA, which is right there. What Massachusetts essentially said is you talk a lot about the nature of the science surrounding this question that was at issue in that case. That's not sufficient because if what you're saying is that you don't have enough science to answer the statutory question, then you have to say so. So Judge Zaney quoted that from Massachusetts v. EPA, and then in his remedy he said, therefore, you have to respond to this petition consistent with Massachusetts v. EPA. Now, as I understand the government's complaint, they're concerned that Judge Zaney didn't fully paraphrase in other parts of his order exactly what Massachusetts v. EPA said, but he quoted it, and it's really quite clear that that option is there, but it's also quite clear that that's not an option that the government attempted to take when it responded to our petition. In fact, what the government did is precisely analogous to what the Supreme Court said in Massachusetts v. EPA is not allowable. What the government did is it threw out a lot of facts that might apply one way or the other. For instance, on the one hand, it said, well, states are fixing the problem, which if that were true, that might incline toward a negative decision, and then almost in the same breath it said, whatever the states are doing isn't actually making a dent in the problem because we still have a dead zone as big as the state of Connecticut and multiple other problems, and then rather than saying, yes, we're making a positive determination because the states are handling it, because the states, a negative determination because the states are handling it, or we're making a positive determination because they're not, or we can't really say at this point because we lack X, Y, and Z information to say, it didn't do any of that. It did exactly what the agency had done however many years ago in Massachusetts. It threw out a lot of facts and then said we prefer not to say one way or the other because we don't like the consequences. So it's really pretty clear looking at that track record that EPA's problem is not with making a necessity determination. All the way back in 1998, the agency clearly said this is a major problem. We are going to give the states three years to get their act together, and if they don't, we are going to make necessity determinations for all the states. It's not that hard. The EPA has indicated it's not that hard. What they are concerned about is what flows from a necessity determination, and be that as it may, the Supreme Court was also very clear on that point. What the court said is yes, the structure of the statute is going to have something to say about how the agency uses its resources. So if EPA has an issue with that, then they need to take it up with Congress, but it's really pretty clear what they need to do. So what they are being asked to do is really a fairly straightforward determination, and I think it's important to point out here that there are really very clear statutory bounds here that EPA did not comply with, and I think that this really goes both to the decisional issue and to the jurisdictional issue. What Section 303.C.4.B. says is that whenever EPA makes a determination that federal standards are necessary in order to meet the purposes of the statute, that regulations must flow from that, and it's really fairly clear what the purposes of the statute are. It's not a roving decision. You can look at Section 101 of the Clean Water Act, which defines what the goals of water quality standards have to be, and then the Clean Water Act itself in Section 303, which actually begins with the words, in order to meet the purposes of the statute, that the following shall be done, and it goes on to describe what's actually a fairly cooperative system of the states and the federal government working together and defines pretty clearly what needs to be done. So those were the bounds that were set up for EPA to make a decision, and they didn't do it. But it's cooperative reaching goals, and MassEPA was much more, here's an emission standard, period. Yes, but that does not change the ultimate. First of all, it does not change the holding in Massachusetts v. EPA, which is that ultimately they are responsible for responding to our petition, and I think the other important thing to emphasize is that . . . They're responsible for answering your petition. Yes, they're responsible for responding to our petition within the bounds of the statute. In other words, just like in Massachusetts v. EPA, the word judgment was not a roving license to ignore the statutory text, neither is the word determination. So the Supreme Court was very clear that they had to answer, and they were also clear about the fact that in the absence of a petition, yes, there was considerable discretion and latitude about when the decision was made, but the important holding is the idea that a petition compels a response within the statute and that it is also a focal point for reviewability. And I'd like to transition on that, if I could, to the subject . . . Let me just ask you this. What would be a satisfactory answer to you that the EPA would give, explaining why they are not going forward on this? A satisfactory answer would go to the question directly of necessity. The question of necessity, whether federal standards are necessary, can be readily accessed through the text of Section 303, which defines essentially what the goals are and how they should be met. And this is a whole process that has gone on for many years and continues to go on of federal oversight over a state-led process. The federal government has really since 1972 . . . No one's arguing that that's not correct. So in this particular fact situation, what would be satisfactory to your client for the EPA to explain why they are not going to go forward? The EPA would need to look at whether the purposes of the statute are in fact being met with respect to algae pollution. And they would need to tell us either no federal action is necessary in order to meet the purposes of the Act, or yes, federal action is necessary for the following reasons, because we have this dead zone, or they could say we need the following information in order to determine whether federal standards are necessary. And we do not have it right now. We won't have it until such-and-such time. Could they say it's vital to us to have engagement by the states and not have an antagonistic relationship? That, I do not believe, would be sufficient. Because were they to say that, what they would essentially be saying is that they are in a sense foreclosing for all purposes using an option that the government gave them to use. I mean, essentially the way this is set up is that they walk the states through this process, but the buck stops with EPA. And were EPA to say, as essentially they did here, we're not going to say one way or the other whether standards are necessary because we prefer not to regulate, that is really tantamount to a rejection of this whole statutory mechanism and a rejection of the concept that the buck stops at the EPA. They're letting the buck stop back with the states who aren't doing something. When I asked him just numbers of times previously, because you both work in this area so much, would you agree with the numbers? How many negative determinations against states have been made? I have no reason to disagree with the numbers that EPA has put forth. So clearly EPA has shown the confidence and muscle in the past. It isn't a constant avoidance that we've seen, although you would say maybe as to the dead zone there has been? On this particular issue, it is an entire decade, more than a decade-long story of relentless avoidance of the problem. That is really what's going on here. You had EPA in 1988 recognizing a problem that actually it and everyone else had recognized for many years, saying this is a national crisis. We'd better do something. States, you have exactly three years, and don't make us come over there. Well, the states didn't do anything, and EPA didn't do anything, and ever since then you have had essentially a history of periodic dithering by EPA about how serious the problem is, punctuated by the same strategies that haven't worked. And what is deeply concerning to us in this situation, back to the overall context, is EPA is seeking a license to continue doing just that when that is not what the statute sets them up to do. And I would point out that a holding here that there is no jurisdiction of this court to oversee what EPA does is particularly problematic with respect to the Clean Water Act because that statute is set up not only in 303 but in many other places with this scheme of having the buck stop at EPA in a cooperative relationship.  EPA can't continue to work cooperatively with the states even after a necessity determination, but it's really a problem if the courts can't review EPA's refusal to have the buck stop on its desk. Let me pick you up on that juncture. I suppose the district court here had, as it did, assumed it had jurisdiction, but the district court then said that the EPA acted within its discretion. Would you be maintaining that error? Yeah. The EPA really did not use its discretion appropriately because it was required to exercise discretion within the bounds of the statute. The statute required a determination of necessity, and instead what EPA gave was a determination that it didn't like the statutory scheme and didn't like the consequences of that determination, so no. So no what? So no, it would not have been appropriate for the court to hold that EPA appropriately exercised its discretion here because that discretion clearly was not exercised within the bounds of the statute. They did exactly what the agency had done in the Massachusetts versus EPA situation, which is that they had thrown out a lot of facts that might go to one factor or another, and then given what the court termed a laundry list of reasons not to regulate. That's exactly what we got here, the laundry list. So you maintain that the district court could move directly to the decision that a necessity determination should be issued and direct the agency to do so? No, I'm sorry, Your Honor. That is not what I'm saying. We did not ask the district court to make the necessity determination for EPA. We made very clear... No one asked them to do it. No, the court, we did have a second count, which we did not appeal, that indicated that we thought it was arbitrary and capricious that the agency had failed to make a necessity determination, but that is not the issue before this court. The issue that's before this court is solely the question of whether EPA was required to give us a straight answer, and what Judge Zaney held was no. The agency did not, in fact, give you the straight answer based on the statute that they were required to give. So what, in your view, should we do? Affirm the district court's ruling that no one saw it? You should absolutely do that, because the district court ordered something that was really... You should have done it, but you got it right? Yes, I think that Judge Zaney... For what reasons? I'm sorry? You got it right, but for the wrong reasons? Well, I wouldn't even say that. What the court... Did the court show that he made a decision that this was a genuine abuse of discretion, or was it a decision, a binary decision, that we've got jurisdiction, you've got to do this? Yes. And so if I understood the question right, I think what Judge Zaney held was that what the agency did here was not an appropriate use of its discretion, because it was not... They didn't give us a yes, a no, or we can't answer that was within the bounds of the statute. That's what the court did. Now, the court went on with some dicta about what will happen when EPA does respond in accordance with Massachusetts v. EPA, the court said. But specifically, that dicta was oriented toward a question that the court understood us to be asking, which actually we weren't, which is whether the decision is strictly confined to the bounds of science, whether EPA's decision has to be grounded in science and science alone. We had not said that, but that essentially was what the court concluded in dicta, was that when EPA goes back and does its job, I don't think that that decision has to be confined to science. Be that as it may, nevertheless, that was essentially in dicta, as it need be, because the agency hasn't actually responded to the statutory question. When they do, we can have that conversation before the court. But just based on the arguments today, why am I wrong to say that if we aren't persuaded by their jurisdictional argument, it seems like what you're both saying is converging to the same thing? No, because what the agency is saying is that if you're not persuaded by the jurisdictional argument, you still have to remand this back to Judge Zaney to clarify his order, because they feel that Judge Zaney was not clear enough in saying that there was a third option. I think Judge Zaney was pretty crystal clear on that point. He quoted the very portion of Massachusetts v. EPA that says that this option of declining to respond is there. There is no need for a remand. The people who now have to take charge of this are EPA. They're the ones who administer the statute. They have to set forth what the statutory factors are for determining necessity. They have to make a decision. And then we will all have something to talk about. Before that, we're all just speculating about exactly how to define the statutory factors. The agency is charged with doing that. They need to go back and do their jobs and respond according to the law. So, I see that I only have a few minutes here. Under the District Court's order, if it stands as written, what discretion remains with the EPA?  remains to, within the bounds of Massachusetts v. EPA, respond either, yes, federal standards are necessary, no, federal standards are not necessary, or, for the following reasons, we are unable at this time to determine whether federal standards are necessary and, therefore, we cannot at this time answer the question. That was what Massachusetts v. EPA allowed the agency to do back then. Judge Zaney quoted that and said you need to go back and respond in accordance with that. So, yes, they have those three options, but the judge was very clear that the response must be within the bounds of the statute. This is really a pretty straightforward situation. The agency needs to give us a straight answer to our question. Judge Zaney has ordered them to give that straight answer in accordance with the law. At this point, they just need to go back and do that. The Eleventh Circuit decision that they're putting emphasis on. That Eleventh Circuit decision really has nothing to do with what's going on here. In that situation, it involved a designation under the Endangered Species Act at a time where there was no law governing the question of critical habitat. So, in that situation, there was genuinely no law to apply because the law to apply had all been developed later. So, the court looked at that and simply said, we have nothing to work with here. This is a very different situation. The Clean Water Act Section 303 is a road map to exactly what law there is to apply. There really isn't a question here. Thank you very much. Ms. Pollard, would you email the air conditioning gnomes and tell them to turn the temperature up so we're not freezing for the next three hours? Thank you. Mr. Littleton, you have time for rebuttal. The air conditioning works well on a cold day. It really does. The colder the day, the better you are. Thank you, Your Honor. I want to actually start in reverse now and start with the merits and then I'll go to jurisdiction. Just to be very clear on what the district court did and did not do, I would direct the court to pages 12 and 13  Record on Appeal, pages 190 and 211. I would direct the court to pages 195-58 to 195-59 and I'll quote, The import of Massachusetts versus EPA decision for the instant case is clear. EPA could not simply decline to make a necessity determination in response to plaintiff's petition for rulemaking, period. That is what the district court held, that EPA did not have the discretion to make, to decline to make a necessity determination. That would have consequences in turn. That would have extraordinary consequences because what it would mean is that anytime anybody files a petition, EPA's internal administrative resources are whipsawed back and forth, commandeered by individual petitioners to say that EPA has to, in Gulf Restoration's words, do a detailed investigation of the scientific data involving particular water quality standards throughout the country. That would really slow the EPA down, wouldn't it? That might not be all bad. Well, that raises another question, Your Honor, which I want to address, but I think the question on the merits is really what did the district court do, and I think it's quite clear from that sentence that I just read to you and the remainder of that paragraph. Let's assume that there was threshold jurisdiction, but that the district court here failed to engage the proper inquiry as to whether the decision was within the abuse of discretion. On this record, could the determination of abuse of record, of abuse of discretion, be sustained? No, Your Honor. It absolutely cannot be on this record. I assume that's your answer. Yes, that's right. That circles back to the question that my colleague asked a while back. Then the relief, go back to the question of what relief do you really seek from this court? That sounds to me like an outright reversal. The relief we seek from this court is a reversal of the district court's order compelling the EPA . . . I don't believe we're on threshold jurisdiction, but I'm assuming that was not hypothetical. I understand. I think the threshold issue of jurisdiction is not an easy question, but I want to focus on the cycling. Assuming for the moment that you disagree with us on jurisdiction, the relief that we're asking for is a remand for the district court to conduct under the extremely limited and highly deferential standard of review prescribed in Massachusetts v. EPA an inquiry into whether the justification that EPA gave here for not making a necessity determination was reasonable. That's the limiting principle, and that in theory means it couldn't be five more years, complete inaction, no measurable metric, and they'd come back in court and say, when? What do we grasp onto? You're saying that limited remand would give some ability? I'm saying that the extremely limited and highly deferential standard of review for EPA's decision not to make a necessity determination would govern any in that case, again, we're assuming that you disagree with us on jurisdiction, but in that case, there would be that review conducted, and the question of whether in any given case EPA had exceeded whatever... But what if the only answer becomes, this is really hard and we're cooperating? And five years later, it's still really hard and we're cooperating? Again, it would be a case-specific inquiry. I can't speak to the individual... I mean, it's a record based inquiry, right? Based on the individual factors at that time, and I would point out, these ongoing cooperative efforts continue, and since the 2011 denial letter, there have been changed circumstances. And so, the question... It's a narrow statutory issue, but it's a huge, very pertinent issue. We have a national crisis, whether it's water quality or immigration, there is no federal action. Can courts step in, or can the government just say, you can't review enforcement decisions? Heckler v. Cheney said that there is a presumption against judicial review of these sorts of decisions. Now, that presumption can be overcome in the presence of manageable statutory standards. And I'm getting back to the jurisdictional question here, but there are no manageable statutory standards here. Gulf Restoration just tried to articulate them, but basically what it went back to was the overarching principles of the statute. Now, every statute is going to have a discernible purpose, and for this, I'd point the court, obviously it's only persuasive authority, but I'd point the court to the district court decision, Sierra Club v. Department of Interior, in our reply brief, which pointed out, look, every statute's going to have a discernible purpose. The issue is whether the particular question here, which is when and whether EPA must make a necessity determination, is governed by any manageable standards. Every time you have an argument that there's an action committed to agency discretion by law, you're going to have this parade of horrible scenario where the agency could completely abdicate its responsibility. But the question, as indicated in Heckler v. Cheney and this court's decision in the city of Seabrook, is whether Congress provided manageable standards for judicial review, and you can't assume bad faith on the part of the agency, absent a clear congressional indication to the contrary. All right. Thank you, sir. Thank you.